J-S28017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 411 WDA 2023 |

Appeal from the Order Entered March 14, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000133-2022

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY OLSON, J.:                    **FILED: OCTOBER 6, 2023**

A.B. ("Mother") appeals from the order entered on March 14, 2023, which involuntarily terminated her parental rights to her female, two-year-old child, L.M. ("Child"), who was born in October 2020.[1]  We affirm.

The trial court ably summarized the underlying facts of this matter:

> [Following L.M.'s birth, L.M.] remained in the family home with Mother and [J.M. ("Father"),] until August of 2021.  In August, it was reported to [the Allegheny County Office of Children, Youth, and Families ("OCYF")] that Mother fled the family home after being assaulted by Father and had taken [Child] to a shelter.  OCYF began an investigation into the family's circumstances and Mother reported that she suffered

---

* Former Justice specially assigned to the Superior Court.

[1]  The trial court terminated the parental rights of putative father, J.M., and any unknown father.  *See* Trial Court Order, 3/14/23, at 1.  Neither J.M. nor any unknown father has filed a separate appeal, and they are not participants in the instant appeal.

broken ribs as a result of this incident. Mother also disclosed a history of domestic violence with Father. Despite the injuries and the history of violence in the relationship, Mother declined to get a Protection from Abuse order against Father. A few weeks later, OCYF discovered that Mother had left the shelter and returned home with Father. Based on concerns for the child's safety, OCYF obtained an Emergency Protective Order on August 26th, 2021 and [Child] was removed from Mother's care. [Child] was placed in the kinship foster home of her maternal grandmother, [T.W.].

On September [28], 2021, [Child] was adjudicated dependent. The court ordered [Child] to remain in her foster care placement. Mother was ordered to follow through with a final Protection From Abuse order against Father, to engage in mental health treatment on a consistent basis, to complete intimate partner violence counseling (hereinafter "IPV"), and to attend supervised visitation.

In November [] 2021, OCYF received reports that the foster mother was allowing the parents to care for [Child] unsupervised. Due to these concerns, [Child] was moved into the foster home of her biological half-sister, [J.C.]. In January [] 2022, the West Mifflin police were dispatched to Father's home. Officer Christopher Miller testified that he witnessed Father pick Mother up and slam her onto a set of steps, and then repeatedly strike her. Officer Miller then presented his taser and commanded Father to stop and show his hands. Father did not comply and held Mother in front of him in a "hostage stance." Father then pulled Mother back inside and tried to close the door. Police were able to prevent him from closing the door and eventually subdued Father while inside the residence. While inside, police officers discovered a firearm and several spent shell casings near the door. Father was arrested and charged criminally as a result of this incident. Mother did not seek a Protection from Abuse order after this assault.

A Permanency Review Hearing was held on May [3], 2022. [Child] was ordered to remain in her foster care placement with [J.C.]. [J.C.] was appointed the secondary educational and medical decision-maker for the child. Mother was found to be in moderate compliance with the permanency plan and to have made minimal progress towards alleviating the

circumstances which necessitated the original placement. The court ordered Mother to participate in mental health treatment, and to obtain stable housing.

The parties appeared for a Permanency Review Hearing on August [2], 2022. The court ordered [Child] to remain in the foster care placement of [J.C.]. Mother was found to be in minimal compliance and to have made minimal progress. The court found that Mother had been unsuccessfully discharged from her coached parenting program and has been inconsistent with her mental health treatment and visitation. The court ordered Mother to reengage with coached visitation, to complete an updated drug and alcohol evaluation and follow all recommendations, and to submit to urine screens and mouth swabs. On September [27], 2022, OCYF filed a petition to involuntary terminate Mother's parental rights [to Child].

A Permanency Review Hearing was held on November [9], 2022. The court ordered [Child] to remain in the foster care placement of [J.C.]. Mother was found to be in minimal compliance and to have made minimal progress. The court found that Mother refused to engage with parenting services until recently and had been inconsistently attending visitation and [Child's] medical appointments. Mother had also been referred to the Woman's Empowerment Club and had not completed that program. The court ordered Mother to attend the psychological evaluations which had been previously ordered, to participate in coached parenting, to attend visitation consistently, to re-engage with IPV counseling and to work with the Women's Empowerment Club.

Dr. Eric Bernstein was the court-appointed psychologist assigned to evaluate the family in this case. He conducted an individual mental health evaluation of Mother in August [] 2022. An interactional evaluation between [Child] and Mother was scheduled for this time period but had to be rescheduled after Mother failed to appear. In the individual evaluation of Mother, Dr. Bernstein diagnosed Mother with clinical depression. He recommended that Mother attend outpatient counseling for a minimum of three to six months and to consider meeting with a psychiatrist for medication management. Dr. Bernstein testified that he made these recommendations based upon Mother's history of incurred

domestic violence. He opined that three months would be on the lower end of treatment time needed to effectuate substantive change but that six months would ideally "allow for a bit more depth in investigation of her mental health and offer her support techniques to cope more effectively from her distress." It was concerning to Dr. Bernstein that Mother minimized the domestic violence between herself and Father. She reported to suffering some injuries but largely downplayed the incidents which had been reported by OCYF to Dr. Bernstein. Mother did finally appear for the interactional evaluation in November of 2022. In the interactional evaluation of Mother and [Child] conducted by Dr. Bernstein, he reported that she showed familiarity with [Child's] needs and that the interaction was positive.

Trial Court Opinion, 5/10/23, at 2-5 (citations omitted).

On March 14, 2023, the trial court entered an order that granted OCYF's petition and terminated Mother's parental rights to Child under 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). Mother filed a timely notice of appeal. She raises two claims to this Court:

> 1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8)?

> 2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [OCYF] met its burden of probing by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 6.

We review involuntary termination orders for an abuse of discretion which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When

applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by Section 2511 of the Adoption Act. If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, then the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We have long held that, in order to affirm a decree terminating parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004). As such, we analyze the trial court's termination order pursuant to Section 2511(a)(2) and (b), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *quoting* *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (internal citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017), *quoting* *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). As such, "[a] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re S.C.*, 247 A.3d at 1105, *quoting* *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010).

The trial court thoroughly explained the factual basis for its finding of termination under Section 2511(a)(2):

> As a part of the court's analysis pursuant to 23 Pa.C.S. 2511(a), the court considers the goals set for a parent through Family Service Plans as well as in court hearings. Mother's goals remained largely the same throughout the case and included attending IPV counseling, consistently attending visitation, mental health treatment, completing a coached parenting program, obtaining stable housing, engaging with the Kid's Club and Mom's Empowerment Program, ensuring [Child's] medical needs were met and cooperating with OCYF and other service providers.

Addressing intimate partner violence concerns was a crucial goal for Mother as domestic violence has been the primary concern in this case. Mother has reported to being violently assaulted by Father several times throughout 2021 and 2022. The extent and nature of these assaults has grown increasingly more violent. In April of 2021, Mother reported that Father had attempted to rip her ear off. Mother did obtain a temporary Protection from Abuse order but did not follow through with a final order. In August [] 2021, Mother suffered a broken rib after an assault by Father. She did not obtain a Protection from Abuse order against him. Roughly one month later, Mother reported that Father had physically assaulted her again. Mother did obtain a temporary Protection from Abuse order but did not follow through with a final order. In January [] 2022, Father violently assaulted Mother in plain view of law enforcement. The arresting officer, Christopher Miller, reported that Father used Mother as a "human shield" to prevent being apprehended. Mother did not attempt to get a Protection from Abuse order after this incident and was not cooperative in Father's prosecution for this offense. Officer Miller reported that Mother has not appeared for any court hearing related to this incident. After each incident, Mother has downplayed the severity of the assaults and essentially reported that "everyone fights in relationships." . . .

The court recognizes that there are many factors to consider when determining whether a parent is successful in accomplishing a goal of addressing intimate partner violence. Counseling is a crucial part of this analysis and a key component to providing a victim with resources and support to leave a violent partner. Aside from resources and support, counseling is meant to help victims develop self-awareness and insight into the dynamics of intimate partner violence and ways to safely leave dangerous relationships and avoid future unhealthy relationships. . . .

In this case, Mother has availed herself of counseling through the Women's Center and Shelter and has participated in treatment beyond that of the traditional counseling sessions. Despite her participation with this resource, she has gained little insight into ways to ensure her safety and to reduce her exposure to incidents of intimate partner violence. Mother is largely indifferent to her circumstances. Her overall response

- 8 -

to these incidents, her lack of cooperation with law enforcement and her continuing contact with Father are indicative to this court that Mother has not internalized or used any of the information that she received in IPV counseling. The court has serious concerns for Mother's safety and her limited insight into the impact of intimate partner violence in her life and reunification with [Child]. For these reasons, the court found that Mother did not satisfactorily complete this goal.

Mother's mental health has also been a long-standing concern as she suffers from clinical depression and has been psychiatrically hospitalized several times throughout her life. While it has been some time since Mother was hospitalized for mental health issues, OCYF and the court have continued to have concerns about her mental health. Mother has experienced significant trauma in her life. She was in need of consistent mental health treatment to improve her functioning and to assist in parenting [Child]. These services were vital for her because she needed to demonstrate a significant period of stability in order for [Child] to be returned to her care. Mother has not been independently evaluated for mental health treatment outside of an evaluation by Dr. Bernstein in August [] 2022, where he recommended that she attend outpatient mental health treatment for three to six months. Dr. Bernstein's recommendations were largely based on improving Mother's functioning and decreasing the symptoms she endorsed at her evaluation. Unfortunately, Mother has not meaningfully engaged in mental health treatment and has been unable to make any substantial changes in her functioning. Mother has not made any progress in this regard and as such, the court finds that she did not satisfactorily complete this goal.

Consistent visitation with [Child] was another important goal for Mother. During the [18] months that [Child] was in care, Mother attended approximately half of her scheduled visits. As a component of the visitation goal, Mother was referred to the coached parenting program in March [] 2022. A representative from that program, Kasey Toomey, reported that Mother was discharged in May [] 2022 for noncompliance. Mother was re-referred to this program in November [] 2022 but did not begin working with this service until February [] 2023. All reports from the three sessions

she attended in 2023 were that she did well with [Child]. It appears that Mother has been appropriate at visits she attended outside of coached parenting. She was even able to have some visitation in her home when she obtained appropriate housing. However, her lack of consistency and her inability to satisfy her other court-ordered goals has prevented her from attaining unsupervised visitation. For these reasons, the court found that Mother did not satisfactorily complete this goal.

Mother was also expected to ensure [Child's] medical needs were met. Mother did not consistently attend those appointments and had to be court-ordered to sign paperwork to have [Child] evaluated for developmental and behavioral concerns. [Child] was taken to Children's Hospital of Pittsburgh in August [] 2022 for a small bruise on her eye. There was concern about the cause of the injury, so OCYF had to temporarily remove [Child] from her foster home while they investigated. Mother became upset when she found out that [Child] was going to be placed into stranger respite care overnight. Mother attempted to take [Child] out of the hospital and hospital staff had to intervene to stop her from leaving. Mother then left the hospital and did not return to check on [Child]. Mother has been unable to prioritize [Child] and has not been able to ensure her routine or emergent medical needs have been met. For these reasons, the court found that Mother did not meet this goal.

Housing has long been a concern in this case as Mother typically resides in Father's home when he is not incarcerated. To her credit, Mother was able to obtain appropriate housing while Father has been incarcerated. The court is not confident that Mother can sustain her housing long-term if Father is released from jail. Mother was also court-ordered to participate with the Mom's Empowerment Club in May [] 2022. This program could have provided Mother and [Child] with various activities and additional visitation, which could have had a meaningful impact on the case. Mother did not engage with this program until 2023. It took Mother approximately six months to begin this program and it appears that she completed it on the eve of the termination proceedings. The court finds this late compliance directly correlates to Father's incarceration as Mother chose not to engage with the program until Father

became re-incarcerated. Mother was also court-ordered to cooperate with OCYF and other service providers due to her general instability. She has not meaningfully done so until recently. With respect to these three goals, Mother has experienced limited success.

Father was incarcerated in November [] 2022. It was only after this incarceration that Mother became more compliant with her court-ordered goals. While Father was out, Mother did not successfully complete any of her court-ordered goals and did not meaningfully engage with service providers other than the Woman's Center and Shelter. Given the testimony presented to the court, it is clear that Mother maintains some type of relationship with Father. The court has serious concerns about Mother's willingness to participate in services if Father is released. [Child] has been out of Mother's care since August [] 2021 and the conditions which caused her to come into care have not been remedied. These conditions continue to exist, and Mother's incapacity and unwillingness have caused the child to be without the essential care, control or subsistence necessary for her physical and mental well-being.

Trial Court Opinion, 5/10/23, at 7-11 (citations omitted).

We agree with the trial court's analysis and conclude that the trial court did not abuse its discretion or commit an error of law when it terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2).

With respect to Section 2511(b), this Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further,

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

- 11 -

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Our Supreme Court explained, "[c]ommon sense dictates that courts considering termination must also consider whether the [child is] in a pre-adoptive home and whether [the child has] a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Again, the trial court ably summarized its factual findings regarding the best interest of Child:

> As part of the best interest analysis, the court considered several factors including [Child's] safety, the bond between [Child] and Mother and the bond between [Child] and foster mother. The safety and stability of [Child] is often the most important consideration in cases involving domestic violence between the parents. Exposure to domestic violence in the family home can have lifelong effects on children. Dr. Bernstein explained that it could impact their self-esteem, sense of security and could lead to anxiety, depression, peer conflict, challenges in relationship with family, extreme acting out behavior, and symptoms mimicking ADHD or disruptive behavior disorder. Additionally, Dr. Bernstein reported that if girls are exposed to domestic violence, they are more likely to become desensitized to violence which causes them to be unable to anticipate or appreciate the impact of it and more likely to engage in those type of relationships. Aside from the psychological effects of exposure to domestic violence, the court also has concerns for the physical safety of [Child]. There is no doubt that Mother's continued relationship with Father places both herself and [Child] at risk for serious

- 12 -

physical injury. As part of the safety analysis, the court also looked at whether Mother could provide stability to [Child] if she were returned to her care. The only real periods of stability that Mother has experienced have been when Father was incarcerated for significant periods of time. Additionally, Mother has engaged in unlawful and disorderly behavior as recently as January of 2023. Unfortunately, Mother cannot provide the stability required to parent a young child. If [Child] were returned to Mother's care, the court finds that she would be exposed [to the risks of] instability and homelessness.

OCYF presented limited testimony regarding the existence of a bond between [Child] and Mother. Dr. Bernstein reported that Mother was appropriate during the interactional evaluation but provided limited information about any bond or attachment with her. Dr. Bernstein reported that he had concerns about Mother's level of commitment with [Child] based upon collateral reports made to him. Based upon Mother's lack of consistency and her inability to progress to unsupervised visitation, the court does not believe that [Child] has a necessary and beneficial bond with Mother.

[Child] has been in the care of her half-sister, [J.C.], since November [] 2021. [J.C.] has a biological son close in age and the children get along well. When [Child] was first placed in [J.C.'s] care, [Child] suffered from behavioral issues and night terrors. [J.C.] has been able to address these concerns appropriately. [J.C.] meets the day to day needs of [Child] and offers her comfort and support. The OCYF caseworker reported that [Child] has a "great bond" with foster mother and seeks her out for comfort or to meet her needs. If there were any detriment to [Child] from the cessation of the relationship with Mother, the court believes that [J.C.] could adequately address those concerns.

The court finds that termination of Mother's parental rights would best suit [Child's] developmental, physical, and emotional needs and welfare. [Child] has been in care since August [] 2021 and Mother has only recently begun to engage with services. [Child] is flourishing in her foster home and has developed a loving relationship with her foster mother. The court does not believe that Mother will be able to attain or maintain the stability to provide a safe and loving

> home for [Child]. For those reasons, the court found that termination best suited the needs and welfare of [Child].

Trial Court Opinion, 5/10/23, at 11-12 (citations omitted).

The trial court's factual conclusions are supported by the record and binding on this Court. Therefore, we conclude that the trial court did not err when it terminated Mother's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/6/2023